UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESSICA HOUSER,                                    File No.

    Plaintiff,
                                                   Hon.

v.

BENTZER INC.,
Carl Bentzer, and
Ryan Bentzer,
Individually and Personally,

    Defendants.

---

# COMPLAINT AND JURY DEMAND

---

## COMPLAINT

Plaintiff Jessica Houser, by and through her attorneys, Pinsky, Smith, Fayette & Kennedy, LLP, states as follows:

### Jurisdiction, Venue and Parties

1.    This is an action requesting the Court to remedy violations of:

    i.    Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and factually related violations of the Elliott-Larsen Civil Rights Act, MCL § 37.2101, *et seq.*;

    ii.    The Americans with Disabilities Act of 1990, 42 USC §12101 *et seq.* (the "ADA") and factually related violations of the Michigan's

1

Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.* ("PDCRA"); and

iii.        The Fair Labor Standards Act, 29 U.S. Code § 201 *et seq.* ("FLSA").

2.        This Court has jurisdiction over this Complaint under 42 U.S.C. § 2000e-5(f), 29 U.S.C. §216(b), and 28 U.S.C. §§ 1331 and 1367.

3.        Jessica Houser is a female resident of Berrien County, in the Western District of Michigan, Southern Division.

4.        Defendant Bentzer, Inc. is a business, registered in Michigan and operating in the Western District of Michigan, Southern Division.

5.        Defendant Carl Bentzer is the CEO of Bentzer, Inc. He was responsible for the sexual harassment and subsequent retaliation of Plaintiff, and he was also a decisionmaker as to the termination of Ms. Houser.

6.        Defendant Ryan Bentzer is the CFO of Bentzer, Inc. As to all relevant times, he made decisions as to the terms and conditions, hours, and schedules of Plaintiff. He was also responsible for the refusal to accommodate and the subsequent decision to constructively terminate Plaintiff.

7.        Defendants were at all material times of this Complaint employers pursuant to the provisions of the acts cited above, and they were decisionmakers regarding the pay, duties, hours, employment, and accommodations for Ms. Houser.

5.        Venue is proper within this judicial district under 28 U.S.C. §1391(b).

2

### Factual Allegations

8.      Plaintiff incorporates the previous paragraphs as through set forth herein.

9.      Plaintiff is a former employee of Bentzer, Inc. and worked at the Edwardsburg facility.

10.     Defendants hired Plaintiff on August 26, 2020, initially on a trial basis.

11.     On August 31, 2020, Defendants offered her a permanent position of Quality Control Manager. She initially worked four days and approximately 34 hours per week.

12.     In her position as Quality Control Manager, Ms. Houser's job was to inspect parts and ensure they were in compliance. She also performed some minor work on a computer.

13.     Ms. Houser was known as a hardworking employee, who consistently came early, stayed late, and did whatever she could to be a team player and help the company.

14.     Likewise, Ms. Houser enjoyed her job and appreciated working for Defendants, until she began to experience sexual harassment from the CEO, Defendant Carl Bentzer. Even then, she had every intention of continuing to work for Bentzer long term.

#### A. Medical Restrictions and Bentzer's Total Willingness to Accommodate

15.     Before Defendant Bentzer hired her, Ms. Houser informed CFO Ryan Bentzer, that she had physical weight-lifting restrictions of 20 pounds, stemming a

generative disc disease, a previous spinal injury, and from a recent abdominal surgery. Ryan Bentzer assured her this would not be a problem and that the company would be able to accommodate her as needed in this position, since the position required limited physical duties anyway.

16.    Several days into working for Bentzer, Ms. Houser also informed HR Director, Kelsey Moreno, about her restrictions. Ms. Houser explained about her recent surgery and history of other procedures that have left her with permanent restrictions. Ms. Moreno also assured Plaintiff this would not be a problem and that Bentzer would be able to accommodate her as needed in this position.

17.    Plaintiff believed and relied on Ms. Moreno and Mr. Bentzer's assurances, particularly since she knew the position required limited physical duties anyway and she had every confidence that she'd be able to fulfill the essential functions of the position.

18.    Shortly after this, Plaintiff injured her right arm while at work.

19.    On September 8, 2020, Plaintiff visited her primary care physician regarding the injury of her right arm. She later saw her orthopedic surgeon as well for this injury.

20.    On September 9, 2020, Plaintiff first informed Defendants' HR, Kelsey Moreno, that she had injured her arm at work and that she was unable to use her

right arm at all for work, but Ms. Houser continued working and fulfilling the essential functions of the job without any issues.

21.     On September 24, 2020, Ms. Houser met again with Kelsey Moreno, Ms. Houser's supervisor Scott Kretchman, and Defendant Ryan Bentzer about her injury and accommodation needs. During this meeting, Plaintiff again informed Defendants that she had injured her arm at work, that she was on physical restrictions with her arm (no lifting, no overhead reaching, etc.) for the time being.

22.     Ms. Houser also told them she was going to need surgery, at which point she'd likely need continued accommodations for an unknown length of time. Ms. Houser continued to believe she could still perform the essential functions of the job even with her physical limitations, but out of respect and consideration to the company, she offered to resign if her accommodation needs presented any problems for the company at all.

23.     Defendants, Ms. Moreno, and Mr. Kretchman were all very supportive and encouraging. They continued to assure Ms. Houser that they would accommodate whatever she needed. Everyone understood that Ms. Houser was fully capable of fulfilling the essential functions of her position, even with just one arm/hand.

24.     At the time, Ms. Houser's surgeon believed she needed rotator cut surgery – which is coincidentally the same surgery that Ms. Moreno had experienced a year or so earlier and for which Bentzer had accommodated her as well. Ms. Moreno informed Ms. Houser that she knew all about the surgery and accommodations Ms. Houser was going to need, including that she wouldn't be able to use her arm at all

for some period of time after the surgery. Ms. Moreno again assured Ms. Houser that the company would accommodate this restriction.

25.    Shortly after this, towards the end of October, Ms. Houser's husband lost his job and her family was without insurance coverage. In response, and to keep her employed with Bentzer, the company offered to cover her family's entire insurance expense and asked her to begin working five days per week, instead of four, for a total of 40 hours per week.

26.    During various meetings in November of 2020, Ms. Houser met with Kelsey Moreno and Ryan Bentzer, to determine the best timing for her upcoming arm surgery. It was determined that Ms. Houser's surgery would take place December 17, 2020, so that she would have holiday and vacation pay to cover her time off for recovery. Again, there was another discussion about accommodations she'd likely need during and after this time for her right arm, and Defendants reassured her that they would work with whatever she needed.

27.    Ms. Houser had the surgery, as planned, and returned to work with the medical restrictions she had expected – no use of her right arm. Her right arm was in a sling during this time. Ms. Houser even provided her discharge instructions to Ms. Moreno, confirming the medical restrictions she had and Ms. Moreno accepted the document without objection.

28.    On January 25, 2021, Ms. Houser had a checkup appointment with her surgeon, confirming that she needed to continue avoiding using her arm, and Ms. Houser again provided this information in an update to Ms. Moreno on January 26,

2021.

29.    As promised, Bentzer continued to accommodate Ms. Houser by allowing her to use only one arm to perform her duties. Ms. Moreno had even bought her a basket to help Ms. House gather parts from the floor now that she could only use one arm. Ms. Houser continued to accomplish the essential functions of her job without any complications or complaints from Bentzer.

### B. Complaints of Sexual Harassment and Retaliation

30.    On or around January 28, 2021, Ms. Houser approached her supervisor, Scott Kretchman to tell him about an issue she'd be having with Bentzer CEO, Defendant Carl Bentzer. She informed him that Carl Bentzer had been sexually harassing her for several weeks (throughout December 2020 and January 2021), and that when she denied his advances, he had started to retaliate against her. Houser had initially intended to keep this information to herself because didn't want to seem like a problematic employee – particularly since the Company had been so accommodating with her physical restrictions. However, Carl Bentzer's behavior was continuing and getting to the point where it was causing a lot of distress for her at work.

31.    Carl Bentzer's behavior included, but was not limited to, the following:

   i.    He would ask her inappropriate questions, seemingly geared towards making her feel uncomfortable, like asking if she'd ever experienced sexual harassment in her prior employment situations.

   ii.    He also made inappropriate jokes at her expense and insinuated that

he visualized Ms. Houser and her husband engaged in sexual activity. For example, when she came to work with her arm in a sling, he commented several times that he "couldn't stop" imaging her "riding" her husband "like a cowgirl."

iii.    He also shared with her what he called a "code" game that he used with his friends to identify attractive women. The code involved a gesture, shaping his index and middle fingers into a "v," then pointing back and forth from his own eyes to the attractive woman. After explaining the meaning of this gesture, he started to make the same gesture at her to indicate he found her attractive.

iv.     Carl Bentzer even making physical advances towards her. On or around January 12, 2021, Ms. Houser visited his office to request his donation to a fundraiser. In response, he patted his legs while seated and indicated he wanted her to come sit on his lap.

v.      After she refused several of his advances, Ms. Houser began to notice that Carl Bentzer was treating her differently, and that he was being unpleasant, showing her hostility, and even retaliating against her.

vi.     Carl Bentzer clearly knew what he was doing and that it was making her uncomfortable, as he took additional actions to keep his harassment of her a secret. For instance, he knew Ms. Houser's husband was good friends with Ms. Houser's supervisor, Scott Kretchman, and that they socialized outside of work on occasion. So

he instructed Mr. Kretchman to make sure that Ms. Houser wasn't allowed to talk about work at all in social settings.

32.     Upon information and belief, Ms. Houser is not the first victim of Carl Bentzer's harassment.

33.     Upon information and belief, Defendant Bentzer maintains a sexually discriminatory and harassing environment for women on account of their gender.

34.     Upon information and belief, Defendant has fired numerous employees in order to avoid being held accountable for this discrimination and harassment.

### C. Continued Retaliation, Subsequent Reasonable Accommodation Denial, and Constructive Termination

35.     One day after she reported Carl Bentzer's sexual harassment and subsequent retaliation against her to Scott Kretchman, on January 29, 2021, HR Director Kelsey Moreno, supervisor Scott Kretchman, and CFO Ryan Bentzer called Ms. Houser into a conference room at work to discuss the situation.

36.     Instead of supporting her, however, instead Ms. Moreno and Mr. Bentzer questioned why she was reporting this information to them. Ryan Bentzer also used this meeting as an opportunity to raise Ms. Houser's alleged performance issues *for the first time.*  And yet he refused to tell her what was allegedly wrong with her performance, insisting they could discuss it at her performance review later.

37.     Also at this meeting, Ms. Moreno also warned Ms. Houser not to talk with any other coworkers about any of the discrimination or harassment she'd been facing. Ms. Moreno further told Ms. Bentzer she's there to work and not to make friends.

38.     Confused and distraught that her performance was being questioned (and concerned that this might all be a ruse to distract Bentzer's retaliation against her for reporting the sexual harassment), Ms. Houser emailed all three Bentzer employees that night, asking again to obtain information about the alleged performance problems they had indicated about her in the meeting.

39.     Two business days later, on February 21, 2021, Ryan Bentzer, Kelsey Moreno, and Scott Kretchman met with Ms. Houser to conduct her performance review. Her performance review ended up being largely positive, and the only negative thing discussed was that she needs to ask for help more.

40.     Ryan Bentzer also alleged that Ms. Houser was being blamed for a bad batch of parts that had been shipped. However, Ms. Houser reminded Ryan Bentzer that she was the one who actually flagged the parts were bad in the first place and suggested they be pulled from production – as indicated on her quality sheets for that part. But she had been overruled by a superior (Ryan Bentzer's brother, in fact), and the Bentzer shipped the bad parts despite her objections.

41.     One day later, on February 3, 2021, Ms. Houser suffered an unexpected medical emergency with her right arm at work. The same arm that had been operated on six weeks prior went numb and turned back and blue. Ms. Houser quickly left work and headed to the emergency room. She learned later that her physical condition was likely exacerbated by stress and anxiety that she was experiencing at work.

42.     Ms. Houser needed several weeks off to attend doctor visits and tests to

ascertain the damage and prognosis for her right arm. Bentzer, Inc. accommodated her with the additional time off and Ms. Moreno instructed Ms. Houser simply to keep them updated as to her condition and plans.

43.    Several weeks later, on February 26, 2021, Ms. Houser's doctor released her back to work—with the same restrictions as she had before (no use of her right arm). Ms. Houser met with Ms. Moreno, Ryan Bentzer, and Scott Kretchman and asked to return to work with the same accommodations she'd had before.

44.    However, instead of welcoming her back to work, Defendants emailed her a compensation package on March 4– informing her that they had placed her on medical leave until she could return with *no restrictions.*

45.    Bentzer refused to participate in any discussion about which essential functions of the job Defendants claimed Ms. Houser couldn't perform. They refused to answer how or why their determination was different now than when they had accommodated her with the same restrictions for months before this. Bentzer also refused to engage in any discussion about possible accommodations that would have allowed her to return to work as she had requested.

46.    Ms. Houser had needed various reasonable accommodations throughout her entire employment – since her very first day. So returning to work with no restrictions at all was and always would be impossible for her, and Ms. Houser realized this was Bentzer's way of constructively discharging her.

47.    On information and belief, the only circumstance that had changed between Defendants' reasonable accommodation approvals and subsequent denial

11

was the fact that Ms. Houser reported Carl Bentzer's sexual harassment and retaliation towards her. Accordingly, Defendants denied her these reasonable accommodations as retaliation against her for reporting sexual harassment and because, as she was told by other employees after the fact, she was too much of a "liability" to the company.

### D. Additional Issues and Unpaid Work Time

48.    In addition, throughout her time with Defendants, Ms. Houser frequently needed to work regular and overtime hours to keep up with the demands of the job, which she often did without pay.

49.    Bentzer used both a timecard system, where they had employees punch in and out for their shifts. However, upon information and belief, Mr. Ryan Bentzer would take the timecards and modify what he put in the system for payroll, often reducing the time employees worked by several minutes each shift.

50.    For example, anytime an employee punched in five or ten minutes earlier than their scheduled shift, Ryan Bentzer would take the timecard and enter it into the payroll system—but he would modify the time so that Bentzer only paid the employee at the start of their scheduled shift, instead of the time the employee actually arrived and began working.

51.    Upon information and belief, many employees missed out on five to ten minutes of pay per shift on a regular basis.

52.    Ms. Houser raised this issue with Ms. Moreno, who informed her this is just how Bentzer does it and there's nothing that can be done to change it.

53.    Additionally, the company was aware and even encouraged Ms. Houser to work overtime in the mornings and on evenings/weekends from home.

54.    In early December, Ms. Houser asked Ryan Bentzer for permission to come to work at 6:00am instead of her typical 6:30am start time because she had more work to do than she could accomplish during her scheduled shift. He approved this overtime, but Bentzer never paid her for it.

55.    Kelsey Moreno also approved Ms. Houser's request to take a work computer home to help her work additional hours on evenings and weekends. Several employees, including her supervisor Scott Kretchman, assisted Ms. Houser in bringing the computer and other equipment to her car, with Kelsey Moreno's approval, for additional evening and weekend work.

56.    Defendants failed to pay Ms. Houser for these hours and refused to address the issue when Ms. Houser's attorney raised it.

57.    Upon information and belief, Defendants failed to adequately and accurately record Plaintiff's hours, resulting in significant overtime hours missed and unpaid.

### E. Statutory Prerequisites

58.    On or about November 11, 2021, pursuant to 42 U.S.C. § 2000e–5(d), Ms. Houser filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).

59.    EEOC advised Ms. Houser by letter dated August 5, 2022, a copy of which is attached hereto as Exhibit 1, that she was entitled to institute a civil action

13

in United States District Court within 90 days of receipt of said letter, in accordance with 42 U.S.C. § 2000e–5(f)(1).

**Count I – Violation of Title VII of the Civil Rights Act of 1964 – Gender Discrimination, Sexual Harassment, and Retaliation**

60.    Plaintiff relies on the allegations of all prior paragraphs, as if they were restated herein.

61.    Defendants violated 42 U.S.C. §§ 2000e–2 and 2000e–3 when they discriminated against and harassed Ms. Houser on account of gender, failed to provide an adequate remedy for her complaints of gender discrimination and harassment, and constructively terminated her on account of her gender and in retaliation for her complaints of the gender discrimination and harassment.

62.    Ms. Houser has suffered irreparable harm, in that she has been unlawfully terminated as aforesaid, and she will continue to suffer such harm unless the relief requested herein is granted.

**Count II – Violations of the Elliot-Larsen Civil Rights Act – Gender Discrimination and Retaliation**

63.    Plaintiffs rely on the allegations of all prior paragraphs, as if they were restated herein.

64.    Defendants violated the Elliott-Larsen Civil Rights Act ("ELCRA"), specifically sections 202 and 701, MCL 37.2202 and MCL 37.2701 respectively, when they discriminated against and harassed Plaintiffs on account of gender, failed to provide an adequate remedy for their complaints of gender discrimination and

14

harassment, and terminated them either on account of their gender and/or in retaliation for their complaints of the gender discrimination and harassment.

65.     Plaintiffs have suffered irreparable harm, in that they have been unlawfully terminated as aforesaid, and they will continue to suffer such harm unless the relief requested herein is granted.

### Count III – Violations of the Americans with Disabilities Act

66.     Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

67.     Defendant violated the ADA, specifically Section 12112, when it failed to provide her a reasonable accommodation and constructively terminated her instead, specifically. 42 U.S.C. § 12112(b)(5).

68.     Defendant also violated the ADA when it failed to engage in the legally required interactive process to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

69.     As a result, Plaintiff has suffered and will continue to suffer harm.

### Count IV – Violations of the Michigan's Persons with Disabilities Civil Rights Act

70.     Plaintiff relies on the allegations of all prior paragraphs as if they were restated herein.

71.     Defendant violated the PDCRA when it failed to provide her a reasonable accommodation and constructively terminated her instead.

72.     Defendant also violated the ADA when it failed to engage in the legally

required interactive process to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

73.    As a result, Plaintiff has suffered and will continue to suffer harm.

## Count V – Violations of the FLSA

74.    Plaintiff incorporates the previous paragraphs as though set forth herein.

75.    Plaintiff worked straight time and overtime hours for which she was not paid over the course of her employment, for which Defendants are in violation of Sections 206 and 207 of the FLSA. *See also* 29 CFR § 785.11.

76.    Because Defendants' violation of the Act was not in good faith within the meaning of Section 11 of the Portal to Portal Act (29 U.S.C. § 260), Plaintiff is entitled to liquidated (double) damages under Section 16(b) of the FLSA. Hence, Defendants owes Plaintiff compensation for her unpaid overtime hours, as well as double damages.

## Relief Sought

WHEREFORE, Plaintiffs request that the Court grant the following relief:

A.    Judgement against Defendants in the amount due for any salary, wages, bonuses, employment benefits, overtime compensation, and/or other compensation denied or lost to her by Defendants' unlawful activity, plus interest and any applicable liquidated damages;

B.    Award Plaintiff compensatory damages for mental anguish and emotional distress;

C.      Award Plaintiff punitive damages;

D.      Award Plaintiff her costs and reasonable attorney fees;

E.      Issue an order reinstating Plaintiff in an appropriate position; and

F.      Award Plaintiff such other relief as may be just and equitable.

PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiffs

Dated: October 20, 2022          By:    /s/ Crystal J. Bultje
                                        Crystal J. Bultje
                                        146 Monroe Center, NW, Suite 418
                                        Grand Rapids, MI 49503
                                        cbultje@psfklaw.com

17

## JURY DEMAND

To the extent that jury trial is available as to any of the issues set forth above,

Plaintiffs hereby demand same.


PINSKY, SMITH, FAYETTE & KENNEDY, LLP
Attorneys for Plaintiffs


Dated: October 20, 2022          By:    /s/ Crystal J. Bultje
                                           Crystal J. Bultje
                                           146 Monroe Center St NW, Suite 418
                                           Grand Rapids, MI 49503
                                           cbultje@psfklaw.com